UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------X

MELISSA LEVINE,

                    Plaintiff,

      -against-

SMITHTOWN CENTRAL SCHOOL DISTRICT,
CHARLES PLANZ, DEBORAH KING, STUART
GROSSMAN AND SUSAN KLEIN, individually
and in their official capacity,

                    Defendants.

-------------------------------------------------------------X

**MEMORANDUM & ORDER**

Civil Action No. 05-1728

**APPEARANCES:**

**LEEDS, MORELLI & BROWN, P.C.**
Attorneys for Plaintiff
One Old Country Road, Suite 347
Carle Place, NY 11514
By:    Rick Ostrove, Esq.

**LAW OFFICES OF PETER G. ALBERT**
Attorneys for Defendants
356 Veterans Memorial Highway
Commack, NY 11725
By:    Peter G. Albert Esq.

**HURLEY, Senior District Judge:**

      Plaintiff Melissa Levine ("Plaintiff" or "Levine") commenced this action alleging

disability discrimination in violation of the Americans with Disabilities Act ("ADA"), 42 U.S.C.

§ 12101 *et seq*., 42 U.S.C. § 1983, and the New York Human Rights Law, N.Y. Exec. Law § 296

*et seq.*[1]  Presently before the Court is a motion for summary judgment on behalf of all the

defendants.   For the reasons discussed below, the motion is granted on Plaintiff's federal claims.

Moreover, the Court declines to exercise supplemental jurisdiction over Plaintiff's state claim

and therefore dismisses it without prejudice.

## Background

The following facts are undisputed unless otherwise noted.

Levine commenced employment with defendant Smithtown Central School District (the

"District") on or about September 1, 1999.  She was hired by the District as a school psychologist

for a standard three year probationary term.[2]

During the first two years of her probationary appointment Levine received no significant

negative work performance evaluations.   During those two years Levine was not assigned full-

time to a particular building within the District.[3]

Levine's final probationary year was the 2001-2002 school year, during which she was

---

[1] The ADA claim is asserted solely against the Smithtown School District. Compl. ¶ 29.
The § 1983 and  New York Human Rights Law claims are asserted against all the defendants.
Compl. ¶¶ 30-33.

[2]  The probationary period is three years for most teachers under New York law.  *See,
e.g.,* N.Y. Educ. Law §§ 2509, 2573, 3012, 3014.   Prior to the expiration of the probationary
period, a district and a teacher may enter into an agreement to extend a probationary period for an
additional year when the teacher will not be recommended for tenure.  *See Juul v. Bd. of Educ. of
Hempstead*, 76 A.D.2d 837 (2d Dept. 1980),  *aff'd*, 55 N.Y.2d 648 (1981).  The probationary
appointment allows the district to evaluate the competency of a teacher.  At the end of the
probationary period a teacher may be granted tenure. A teacher who is granted tenure cannot be
disciplined or dismissed except for just cause proven by the district in a due process hearing.  *See*
N.Y. Educ. Law § 3020-a.

[3] The first year of her appointment, Levine was assigned to four elementary schools and
the District office, spending one day per week at each location. The second year, Levine split her
time between the Tackan Elementary School and the District Office.

assigned as the full-time school psychologist to the Tackan Elementary School ("Tackan"). This was the first time that Levine was assigned to work on a full-time basis in a single school building in the District.  Defendant Susan Klein ("Klein") was the principal of Tackan at that time.   The remaining individual defendants, Charles Planz ("Planz"), Deborah King ("King") and Stuart Grossman ("Grossman"), were the Superintendent of the District, the Assistant Superintendent for Personnel, and the Administrator for Special Education and Special Services, respectively.[4]  Grossman was Levine's immediate supervisor during the 2001-2002 school year, having been hired on or about August 2001, and was responsible for evaluating Levine and making the initial recommendation respecting the conferral of tenure upon Levine.  As principal of Tackan, Klein also served as Levine's supervisor during the 2001-2002 school year.

Levine sustained a concussion on October 18, 2001 while trying to restrain a student.  She was out on leave from that date until November 13, 2001.

According to Grossman and Klein, they had concerns regarding Levine's work performance and professional abilities starting in September 2001.  Klein testified at her deposition that the first "red flag" was when Levine was asked to talk to students on September 11, 2001 about the terrorist attacks, but declined because she said she was too upset to talk about it.  According to Klein, "we need a psychologist who can work with students and this was obviously a very traumatic thing, students were very upset and we certainly needed the students to have support and it did not happen through Dr. Levine."  Grossman explained that he determined that Levine failed to complete psychological testing of disabled students in a timely

---

[4] The District, Klein, Planz, King and Grossman will be referred to collectively as "Defendants."

fashion and failed to provide counseling services to disabled students who were mandated to receive such services. Grossman also determined that Levine lacked a sufficient professional commitment and failed to follow-through on her professional responsibilities as a school psychologist.

By memorandum dated November 8, 2001, Levine was advised for the first time of Grossman's concerns regarding her work performance. Levine responded to the memo, explaining, among other things, that when she came to Tackan she had ten to fifteen triennial evaluations[5] of disabled students that needed to be finished and thus had to complete a backlog of work. She also maintained that her failure to provide certain counseling services to disabled students who were mandated to receive such services was caused by her absences, her attendance at building or district team meetings, or her being called to intervene in a crisis situation.

_____

[5] A triennial evaluation, as explained by Levine in her deposition, refers to the updated psychological evaluation required every three years for children who have been classified to receive special education services and have an individualized educational plan (IEP), which evaluation is conducted to determine their current level of functioning academically, socially, emotionally and behaviorally. An IEP means a written statement for each child with a disability that is developed, reviewed and revised in a meeting in accordance with 34 C.F.R. §§ 300.320 through 333.324. An IEP is a mandated requirement of the Individuals with Disabilities Education Act (IDEA) for any pupil in a public school who is found to meet the federal or state requirements for special education and/or related services. An IEP is required to include, among other things: (a) a statement of the child's present levels of academic achievement and functional performance; (b) a statement of measurable annual goals, including academic and functional goals designed to meet the child's needs that result from the child's disability to enable the child to be involved in and make progress in the general educational curriculum and meet each of the child's other educational needs that result from the child's disability; (c) a description of how the child's progress toward meeting the annual goals described in 34 C.F.R. § 300.320(a)(2) will be measured and of when periodic reports on the progress the child is making toward meeting the annual goals (such as through the use of quarterly reports) will be provided; (d) a statement of the special education and related services and supplementary aids and services, based on peer-reviewed research to the extent practicable, to be provided to the child, or on behalf of the child. *See* 20 U.S.C. §1414(d)(1)(A)(I); 34 C.F.R. § 300.320(a).

According to Grossman, on or about November 2001, he made a preliminary determination that he would not recommend Levine for tenure.[6] Between September and early December 2001, Grossman and Klein discussed Levine's work performance. Like Grossman, Klein expressed concerns regarding Levine's job performance at Tackan. During this same period of time Klein advised Planz that Levine had failed to perform, or failed to timely perform, several of her duties and responsibilities as a school psychologist.[7]

On December 7, 2001, Grossman conducted a formal observation of Levine in her

---

[6] Plaintiff did not directly dispute this assertion in her Rule 56.1 Counterstatement of Material Fact. Rather she asserts that "Grossman had no reason not to recommend plaintiff for tenure, as she had received nothing but positive evaluations at that point." Levine points to the absence of any written documentation regarding the "alleged" recommendation and maintains that a jury could believe that such an opinion could not reasonably have been formed as at that point in time she had only worked 27 days in the school year, "especially since such opinion is in contradiction to all prior positive employment evaluations . . . ." Pl.'s Counterstatement ¶ 23.

[7] Plaintiff "disputes" that the conversations between Grossman, Klein and/or Planz occurred and claims that a reasonable jury could conclude that they did not occur. She points to no evidence, however, relying solely on the fact that no documentation of this conversation exists. She also maintains that Grossman's claim that he decided not to recommend her for tenure should not be believed because such an opinion could not have been reasonably formed given that she had only worked 43 days at that point in time and Grossman saw her less than once a week. The Court notes, however, that Grossman's conclusions regarding Levine's failure to timely complete psychological testing and failure to provide counseling services would not be dependent on his personal interaction with Levine, but rather would be based on a review of Levine's records regarding the students at issue. Indeed, during her deposition Levine admitted that as of November 8, 2001 she had not provided all of the mandated counseling, meaning counseling required by a student's IEP, to all of the students for whom she was responsible at Tackan, that providing mandated counseling for a classified student is an important part of a school psychologist's job and that as a school psychologist she could not unilaterally alter the amount of counseling set forth in an IEP. She also testified that her bipolar condition was not the cause of her not providing mandated counseling. When asked if her Lyme disease was the cause of her not providing mandated counseling she responded "I'm not sure." After a break suggested by her counsel, Levine clarified that at the time she did not know what was occurring but, after learning about the symptoms of each condition and in hindsight, she could understand how they were significantly impacting her performance.

capacity as the Chairperson of the building level Sub-Committee on Special Education (SCSE),

which he memorialized in a Teacher Evaluation Report. Grossman described the SCSE meeting

he observed, and then provided the following analysis:

> Dr. Levine asked a number of open-ended questions in order to
> clarify and expand on comments made about the student. She
> provided clinical analysis in a manner that offered the parent
> insight into the relationship between the testing and the student's
> progress. She approached the meeting in a positive and proactive
> way that appeared to make the parent feel comfortable.
> However, there was a sense from the observer that everyone did
> not share the committee's recommendation. It is important for the
> chairperson of the subcommittee on special education to take a
> leadership role in developing a consensus for the committee. It is
> always helpful to have a prior dialogue with teachers in order to
> come to the meeting and present to the parent clear and concise
> recommendations. The regular education teacher was not aware of
> the decision to declassify and the conversation between her and Dr.
> Levine seemed to suggest that there was no prior conversation
> concerning this case. It is important for Dr. Levine to clearly
> articulate the guidelines concerning a classification of special
> education and the reasons why a student may not be eligible.

According to Grossman, immediately after his observation of Levine, he made the

decision that he would not recommend Levine for tenure.[8] Planz, the superintendent, confirms

that in early December 2001 Grossman informed him that he had observed Levine that she did not

perform well. According to Planz, Klein essentially corroborated Grossman's reports, opinions

---

[8] Plaintiff disputes that Grossman decided he would not recommend her for tenure in
December 2001. Her disputation is based on (1) the absence of documentation of this decision;
(2) that such a decision would not likely have been made based on such a small sample of her
work performance given her two prior years of success; (3) the December 7 evaluation "was not
even bad and it contained positive commentary;" and (4) she was first told her tenure was in
jeopardy in April 2002. Levine's assertions, however, do not contradict the District's claim that
Grossman "puts the wheels in motion for [her] eventual termination" after the December
observation. *See Teachout v. The New York City Depart. of Educ.*, 2006 WL 452022, at *2 n.2
(S.D.N.Y. Feb. 22, 2006).

and evaluations of Levine's performance. During his discussions with Grossman and Klein, the issues of whether Levine should receive tenure was discussed and in each discussion, it was the recommendation of both Grossman and Klein that Levine did not demonstrate professional competence on standards of performance to warrant receiving tenure. According to Planz, "[t]he decision to grant a probationary employee tenure is not a static determination, nor is it tied to a specific time line. Generally, the initial decision of whether to grant tenure to a probationary employee is made during the beginning of the third year of the employee's probationary term; but the decision is not communicated to the employee until the spring of the third year . . . ." Klein's deposition testimony corroborates this time line. According to Klein, Grossman would have received, from the Personnel Office in early December 2001, a list of those individuals for whom he needed to prepare recommendations regarding the grant or denial of tenure.

Starting from on or about December 10, 2001, Levine was continuously absent from work. She was, however, paid her salary and received benefits. By letter dated December 28, 2001, Levine informed King, the District's Assistant Superintendent for Personnel, that Levine had bi-polar disease and needed a continuation of her sick leave. Levine requested several additional extensions of her sick leave, all of which were granted. By letter dated February 28, 2002, Levine advised King of her diagnosis of Lyme disease. By letter dated March 15, 2001, Levine requested that her sick leave be extended through the end of the 2001-2002 school year because of her bi-polar disorder and Lyme disease. She included notes from two of her doctors advising that she must remain out of work through the end of the school year. Levine did not, however, request an extension of her probationary period.

Klein sent Levine a letter dated March 6, 2002, while Levine was still on sick leave,

setting forth concerns about Levine's performance. The concerns included the absence of minutes for SCSE meetings chaired by Levine; the absence of logs for October and December SCSE meetings as required by the Office of Special Education; the failure to share certain history regarding a child with that child's current teacher; and the failure to provide mandated counseling for two students as required by their IEPs. In addition, the letter referred to the SCSE meeting at which Levine was evaluated by Grossman. According to Klein:

> [Levine] declassified a student but it was not clear to the parents, teachers, []or Dr. Grossman who also attended a meeting. The parents were confused and upset when they found out about the determination of the SCSE because they were under the impression that their child would continue to be classified and the committee would reconvene in the spring. I have since spoken to the parents to rectify the situation. The student will remain classified and we will meet in the spring to discuss declassification and placement for next year. . . .

Levine responded to Klein by letter dated March 18, 2002, presenting her side to each of the concerns leveled. She then wrote:

> I want to assure you that I fully understand all of my responsibilities as a full time psychologist in your building. I completed two very successful years at this level. No one has been more frustrated than I have been this year at being forced to be absent for over half a year due to a concussion I sustained during an intervention and an unresolved medical condition. Dr. Petro felt confident that my medical situation would resolve itself and I would be able to return to work rather quickly. He now believes that my entire medical situation may be the result of a previously undiagnosed case of Lyme's disease, which I may have had since last summer. The District is in possession of all of their [sic] appropriate documentation from both of my doctors.
> I feel that because of my medical situation I have been unable to demonstrate the full extent of my abilities this school year. I also recognize that this is the last year of my probation. Considering that I have been absent since December and since this is both your's and Dr. Grossman's first year in Smithtown, I realize

that it would be very difficult for either of you to evaluate my performance based on what you have seen to date. For those reasons I want you to know that I will be notifying the District of my willingness to accept an additional year of probation. I feel confident that once my doctors resolve my Lyme's Disease and I have time to recuperate, I will be able to return to full service at the level that I demonstrated during my first two years in the District. I hope that you will be understanding of what has occurred to me medically this year and support this request.

In a letter dated March 18, 2002, to the Superintendent of the District, Levine wrote:

As I am sure you are aware, I am a third year probationary school psychologist at Tackan Elementary School. I have had a series of medical issues this year that have affected my job performance. In the middle of October I sustained a concussion during an intervention with a student. As a result I was absent for a period of about three weeks. Approximately a month later (December 10th) I began treatment for an unrelated medical condition for which my doctor recommended bed rest. Although he felt that my medical issue would resolve itself quickly, that turned out not to be the case. He now believes that Lyme's Disease, which went undiagnosed until this month, is at the root of my medical problems. I am now being aggressively treated to resolve this condition. While both of my doctors are requiring me to remain on bed rest for the remainder of the current school year, it is with confidence in both of their opinions that I can state that I will be fully recovered by the fall.

Prior to my injury and subsequent illness, I completed two very successful years in Smithtown. Because of my medical situation I feel that I have been unable to demonstrate the full extent of my abilities this year to my principal, Ms. Klein, or Dr. Grossman, my immediate supervisor in Special Education. As first year administrators in Smithtown, both are in a very difficult evaluative position, since they have no prior knowledge of my work in the District. As a result, this would make it very difficult for either of them to make a tenure recommendation on my behalf. For this reason I want you to know of my willingness and interest in accepting an additional year of probation. I feel confident that once my doctors resolve my Lyme's Disease and I have time to recuperate, I will be able to return to full service at the level of competence that I demonstrated during my first two years in the District. I hope that you will be understanding of what has

occurred to me medically this year, place some trust in my first two
years of evaluation, and grant my request for a one-year extension
of my probation.

By letter dated April 15, 2002,[9] Planz advised Levine that her request for an extension of

her probationary period was denied and that he would not be recommending her to the Board of

Education for tenure and would be recommending her termination.[10]  According to Defendants,

Levine's probationary period was not extended because another year would not have remedied

what had been determined to be lacking from Levine's job performance.

For the 1998-1999 school year only one teacher in the District requested an extension of

probation and the request was granted. In each of the 1999-2000 and 2000-2001 school years, only

one request for an extension was received and denied.  For the 2001-2002 school year, four

teachers in the District requested and received extensions of their probationary periods while

fourteen teachers (including Levine) requested but were denied extensions.  In 2002-2003, two

probationary extensions were granted and seven were denied.  In 2003-2004, four extensions were

granted and 16 were denied.  In 2004-2005 no extensions were granted and nine were denied.

---

[9] The letter was resent on April 18, 2002, correcting the date of a board of education
meeting referred to therein.

[10]  Under New York law, before the end of a teacher's probationary period, the
superintendent recommends, in writing, to the board of education that those teachers found to be
competent and satisfactory be granted tenure. *See* N.Y. Educ. Law §§ 2509, 2573, 3012, 3014.
Absent a recommendation of the superintendent, the board of education cannot make a tenure
appointment.  *See Anderson v. Bd. of Educ.*, 46 A.D.2d 360 (2d Dept. 1974), *aff'd*, 38 N.Y.2d
897 (1976).  Probationary teachers are entitled to certain notices if they are being dismissed
during their probationary period or if an affirmative recommendation for appointment on tenure
will not be made.  *See* N.Y. Educ. Law §§ 2509, 2573, 3012, 3031.  A denial of tenure is
accompanied by termination because a teacher who is allowed to teach after the probationary
period has expired can acquire tenure by estoppel.  *See generally Gould v. Bd. of Educ.*, 81
N.Y.2d 446 (1993).

By letter dated April 15, 2002, Levine wrote to King and requested two separate "workplace accommodations." First, she repeated her request that her probationary period be extended for an additional year. Second, she requested that she return to work immediately. Attached to the letter was a note from one of her doctor's stating Levine could "return to work without limitations on 4/15/02." Planz made the decision not to permit Levine to return to work in mid-April 2002, although neither his decision nor his purported reasoning was transmitted to Levine. According to Planz, allowing Levine to return that late in the school year would have disrupted the consistency that had been established in providing psychological counseling services to disabled students.

Levine then wrote to Planz on May 3, 2002 and again requested an extension of her probation. Additionally, she requested the reasons for the recommendation that she not be granted tenure. The following reasons for the denial of tenure were provided to her by letter dated May 10, 2002: (1) the failure to timely conduct student triennial evaluations; (2) the failure to provide mandated counseling to students; (3) the failure to timely submit reports; (4) the failure to communicate effectively with parents and staff; and (5) the failure to be an effective SCSE chairperson. On May 28, 2002, the District's Board of Education acted on Planz' recommendation and terminated Levine's employment effective June 28, 2002.

Levine filed a timely charge of disability discrimination with the New York State Division of Human Rights and the EEOC. This action ensued.

## Discussion

### I. Summary Judgment Standard

Summary judgment pursuant to Federal Rule of Civil Procedure 56 is only appropriate

where admissible evidence in the form of affidavits, deposition transcripts, or other documentation demonstrates both the absence of a genuine issue of material fact and one party's entitlement to judgment as a matter of law. *See Viola v. Philips Med. Sys. of N. Am.*, 42 F.3d 712, 716 (2d Cir. 1994). The relevant governing law in each case determines which facts are material; "only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). No genuinely triable factual issue exists when the moving party demonstrates, on the basis of the pleadings and submitted evidence, and after drawing all inferences and resolving all ambiguities in favor of the non-movant, that no rational jury could find in the non-movant's favor. *See Chertkova v. Conn. Gen'l Life Ins. Co.*, 92 F.3d 81, 86 (2d Cir. 1996) (citing Fed. R. Civ. P. 56(c)).

To defeat a summary judgment motion properly supported by affidavits, depositions, or other documentation, the non-movant must offer similar materials setting forth specific facts that show that there *is* a genuine issue of material fact to be tried. *See Rule v. Brine, Inc.*, 85 F.3d 1002, 1011 (2d Cir. 1996). The non-movant must present more than a "scintilla of evidence," *Del. & Hudson Ry. Co. v. Cons. Rail Corp.*, 902 F.2d 174, 178 (2d Cir. 1990) (quoting *Anderson*, 477 U.S. at 252), or "some metaphysical doubt as to the material facts," *Aslanidis v. U.S. Lines, Inc.*, 7 F.3d 1067, 1072 (2d Cir. 1993) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986)), and cannot rely on the allegations in his or her pleadings, conclusory statements, or on "mere assertions that affidavits supporting the motion are not credible." *Gottlieb v. County of Orange*, 84 F.3d 511, 518 (2d Cir. 1996) (internal citations omitted). Affidavits submitted in opposition to summary judgment must be based on personal

knowledge, must "set forth such facts as would be admissible in evidence," and must show that the affiant is "competent to testify to the matters stated therein." *Patterson v. County of Oneida,* 375 F.3d 206, 219 (2d Cir. 2004) (citing Fed. R. Civ. P. 56(e)). "Rule 56(e)'s requirement the affiant have personal knowledge and be competent to testify to the matters asserted in the affidavit also means that an affidavit's hearsay assertions that would not be admissible at trial if testified to by the affiant is insufficient to create a genuine issue for trial." *Patterson*, 375 F.3d at 219 (citing *Sarno v. Douglas Elliman-Gibbons & Ives, Inc.*, 183 F.3d 155, 160 (2d Cir. 1999)).

When determining whether a genuinely disputed factual issue exists, "a trial judge must bear in mind the actual quantum and quality of proof necessary to support liability," or "the substantive evidentiary standards that apply to the case." *Anderson*, 477 U.S. at 254-55. A district court considering a summary judgment motion must also be "mindful of the underlying standards and burdens of proof," *Pickett v. RTS Helicopter*, 128 F.3d 925, 928 (5th Cir. 1997) (citing *Anderson*, 477 U.S. at 252), because the evidentiary burdens that the respective parties will bear at trial guide the district court in its determination of a summary judgment motion. *See Brady v. Town of Colchester*, 863 F.2d 205, 211 (2d Cir. 1988). Where the non-moving party will bear the ultimate burden of proof on an issue at trial, the moving party's burden under Rule 56 will be satisfied if he can point to an absence of evidence to support an essential element of the non-movant's claim. *See id.* at 210-11. Where a movant without the underlying burden of proof offers evidence that the non-movant has failed to establish her claim, the burden shifts to the non-movant to offer "persuasive evidence that [her] claim is not 'implausible.'" *Brady*, 863 F.2d at 211 (citing *Matsushita*, 475 U.S. at 587).

In deciding a summary judgment motion, a court must resolve all factual ambiguities and

draw all reasonable inferences in favor of the non-moving party.  *See Donahue v. Windsor Locks Bd. of Fire Comm'rs*, 834 F.2d 54, 57 (2d Cir. 1987).  That being said, it is well-established that a non-movant cannot defeat summary judgment with nothing more than "unsupported assertions," *Goenaga v. March of Dimes Birth Defects Found.*, 51 F.3d 14, 18 (2d Cir. 1995), or the allegations in its pleadings.  *See Cifarelli v. Vill. of Babylon*, 93 F.3d 47, 51 (2d Cir. 1996); *see also* Fed. R. Civ. P. 56(e).  More particularly, although "summary judgment should be used sparingly" in cases where the material fact at issue is the defendant's intent or motivation, the plaintiff must nevertheless offer some "concrete evidence" in his favor, and is "not entitled to a trial simply because the determinative issue focuses upon the defendant's state of mind."  *Dister v. Cont'l Group, Inc.*, 859 F.2d 1108, 1114 (2d Cir. 1988).  "The summary judgment rule would be rendered sterile . . . if the mere incantation of intent or state of mind would operate as a talisman to defeat an otherwise valid motion."  *Meiri v. Dacon*, 759 F.2d 989, 998 (2d Cir. 1985).

## II.  Plaintiff's ADA Claim

Levine alleges, *inter alia*, that she was discharged due to her disability in violation of the ADA.  The ADA prohibits employment discrimination by a "covered entity . . . against a qualified individual with a disability because of the disability of such individual."  42 U.S.C. § 12112(a).  Employers of persons with disabilities are required to make reasonable accommodations for otherwise qualified individuals with disabilities and are prohibited from retaliating against an employee engaged in activities protected under the statute.  *See id* §§ 12112(b)(5)(a), 12203(b).

Employment discrimination claims under the ADA are evaluated under the now familiar burden-shifting analysis set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-805 (1973).  Under *McDonnell-Douglas* and its innumerable progeny, (1) a plaintiff must first

establish a prima facie case of discrimination; (2) the burden then shifts to the employer to articulate a legitimate, nondiscriminatory reason for its actions; if the employer does so, the *McDonnell-Douglas* framework and its presumptions and burdens disappears, leaving the sole remaining issue of "discrimination vel non;" and thus, (3) the burden shifts back to the plaintiff to prove that the employer's stated reason is merely pretextual and that discrimination was an actual reason for the adverse employment action. *See Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 143 (2000). Although intermediate evidentiary burdens shift back and forth under this framework, "[t]he ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." *Id.*

In order to establish a prima facie case of discrimination under the ADA, a plaintiff must show that: (1) her employer is subject to the ADA; (2) plaintiff was disabled within the meaning of the ADA; (3) plaintiff was otherwise qualified to perform the essential functions of her job, with or without reasonable accommodation; and (4) plaintiff suffered an adverse employment action because of her disability. *See Jacques v. DiMarzio, Inc.,* 386 F.3d 192, 198 (2d Cir. 2004) (citing *Cameron v. Cmty Aid for Retarded Children, Inc.,* 335 F.3d 60, 63 (2d Cir. 2003)); *Shannon v. N.Y. City Transit Auth.,* 332 F.3d 95, 99 (2d Cir. 2003). "In so-called reasonable accommodation cases, . . . the plaintiff's burden 'requires a showing that (1) plaintiff is a person with a disability under the meaning of the ADA; (2) an employer covered by the statute had notice of his disability; (3) with reasonable accommodation plaintiff could perform the essential functions of the job at issue; and (4) the employer has refused to make such accommodations.'"

*Graves v. Finch Pruyn & Co., Inc.,* 457 F.3d 181, 183-84 (2d Cir. 2006) (citations omitted). [11]

There is no dispute that the District is a covered entity. Accordingly, the Court shall proceed to the issue of whether Plaintiff is disabled within the meaning of the ADA.

**A. Disabled Within the Meaning of the ADA**

An individual with a "disability" is defined as any person who (1) has a physical or mental impairment that "substantially limits" one or more "major life activities"; (2) has a "record of such impairment"; or (3) is "regarded as" having such an impairment. 42 U.S.C. § 12102(2). Disability determinations are made on a case by case basis. *Reeves v. Johnson Controls World Servs. Inc.*, 140 F.3d 144, 151-52 (2d Cir. 1998). Plaintiff asserts that she qualifies under each of the definitions.

> 1. Does Plaintiff suffer from an impairment that
> <u>substantially limits one or more life activities?</u>

To meet the first ADA definition of disability, (1) a plaintiff must show that she suffers from a physical or mental impairment; (2) the plaintiff must identify the activity that is claimed to be impaired and establish that such activity constitutes a "major life" activity; and (3) the plaintiff must show that her physical or mental impairment "substantially limits" the identified "major life activity." *Jacques,* 386 F.3d at 201; *accord Ramirez v. New York City Bd. of Educ.*, 481 F. Supp. 2d 209, 217 (E.D.N.Y. 2007).

Defendants concede, for purposes of this motion, that Plaintiff suffers from a physical or mental impairment given she was diagnosed with both bi-polar disorder and Lyme disease, both

---

[11] Defendants argue that the § 1983 claim must be dismissed because there is no viable underlying ADA claim. Plaintiff responds that she "has stated an ADA claim; thus there is no need to further address defendants' 1983 arguments." Pl.'s Opp. Mem. 20 n.6. The Court, like the parties, shall treat the § 1983 as surviving or failing with the ADA claim.

of which may constitute a physical and/or mental impairment.  *See, e.g., Jacques*, 386 F.3d at 199

(bi-polar disorder may constitute an impairment); *Worster v. Carlson Wagon Lit Travel Inc.*, 353

F. Supp. 2d 257 (D. Conn. 2005) (Lyme disease may be a disability under the ADA).  The Court

thus turns to whether the activity that is claimed to be impaired constitutes a major life activity

and whether the impairment substantially limits the identified major life activity.

"Major life activities are activities that are of central importance to daily life. . . . The

EEOC regulations define major life activities to include functions such as caring for oneself,

performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working."

*Capobianco v. City of New York,* 422 F.3d 47, 56 (2d Cir. 2005) (internal quotations omitted)

(quoting *Toyota Motor Mfg., Kentucky, Inc. v. Williams*, 534 U.S. 184, 197 (2002); 29 C.F.R. §

1630.2(I)).  "In determining whether a limitation is 'substantial,' courts consider the nature and

severity of the impairment, the duration or expected duration of the impairment, and the

permanent or long term impact of or the expected long term impact of or resulting from the

impairment. . . . For purposes of the ADA, short term, temporary restrictions are not 'substantially

limiting' and do not render a person 'disabled.'"  *Conley v. United Parcel Serv.*,  88 F. Supp. 2d

16, 19 (E.D.N.Y. 2000).  *See Capobianco*, 422 F.3d at 57.  As one court has recently noted:

> To establish a disability under the ADA, there must be some proof
> of permanency.  *See Adams v. Citizens Advise Bureau,* 187 F.3d
> 315, 316-17 (2d Cir. 1999).  In other words, the limitation on the
> claimed major life activity cannot be temporary.  *Id.* (temporary
> neck, back, and knee injury lasting three and a half months not a
> disability); *Colwell v. Suffolk County Police Dep't*, 158 F.3d 635,
> 646 (2d Cir. 1998) (temporary impairment of seven months not
> substantially limiting); *McNamara v. Tourneau, Inc.*, 496 F. Supp.
> 2d 366, 376 (S.D.N.Y. 2007) (injury lasting only eight weeks not a
> qualifying disability); *Williams v. Salvation Army*, 108 F. Supp. 2d
> 303, 312-13 (S.D.N.Y. 2000) ("temporary, non-chronic

> impairments of short duration, with little or no long-term or
> permanent impact, are usually not disabilities.").

*Green v. New York City Health and Hospital Corp.*, 2008  144828, at * 4 (S.D.N.Y. Jan. 15, 2008).  It is the limitation on the claimed major life activity that must be permanent or have a long term impact.  The permanency of the mental or physical condition leading to the impairment is not necessarily sufficient. *See Toyota Motor,* 534 U.S. at 198 (diagnosis alone does not establish a disability within the meaning of the ADA; the impairment's impact must be long term).

Moreover, in determining how a particular impairment affects a particular plaintiff, the Court must consider any corrective or mitigating measures taken by that individual.  *See Sutton v. United Air Lines, Inc.,* 527 U.S. 471, 482-84 (1999).  For example, an individual who is able to virtually eliminate the effects of an impairment through medication is not considered disabled for purposes of the ADA.  *See id.* at 483; *accord Teachout v. New York City Dept. of Educ.*, 2006 WL 452022 (S.D.N.Y. Feb. 22, 2006).

Defendants argue that even if Levine's impairments actually affected the major life activity of working, her claim must fail.  Defendants maintain that any limitation on the activity of working was short-lived as opposed to long term or permanent as Plaintiff stopped working in December 2001 and was cleared by her doctors to return to work by April 15, 2002.  Defendants are correct.  To the extent that Plaintiff claims her bipolar disorder and Lyme disease limited the life activity of working, her inability to work for four, or even six, months is insufficient to meet the substantial requirement.  *Cf. Colwell v. Suffolk County Police Dept.*, 158 F.3d 635, 646 (2d Cir. 1998) (temporary impairment of seven months not substantially limiting); *Mescall v. Marra,* 49 F. Supp. 2d 365, 373 (S.D.N.Y. 1999) ("assuming that [plaintiff] was incapable of performing

a broad range or class of jobs from February 1997 through June 3, 1997, the date [plaintiff] claimed she would be able to return to work at P.S. 21, such a temporary mental condition would not qualify as a disability under the ADA").[12]  The inquiry does not end, however, because, although not the model of clarity, Plaintiff's papers suggest she is claiming that other major life activities, including her ability to care for herself, were impaired.

To raise an issue of fact as to whether a claimed impairment substantially limits a major life activity, a plaintiff must present more than mere conclusory allegations.  Rather, a plaintiff must provide specific information detailing the nature and length of the limitation, together with supporting medical evidence regarding the duration and severity of the impairment's impact on the major life activity at issue.  *See, e.g., Mikell v. Waldbaum, Inc.*, 2003 WL 21018844 (S.D.N.Y. May 5, 2003) (conclusory statements about plaintiff's inability to walk, dress herself, and get out of bed, without reference to medical or other evidence regarding the duration and severity of impairment's impact on these activities insufficient to defeat summary judgment); *Mazza v. Bratton*, 108 F. Supp. 2d 167, 175 (E.D.N.Y. 2007) (conclusory assertion in affidavit that plaintiff had difficulty in performing such routine tasks such as cooking, cleaning, shopping and showering insufficient to make a prima facie showing that his ability to care for himself was substantially limited) (citing *Ryan v. Grae & Rybicki,P.C.*, 135 F.3d 867, 871-72 (2d Cir. 1998)).  *Cf. Teachout,* 2006 WL 452022, *4 (a plaintiff does not satisfy burden under the ADA by showing

---

[12]  The Court also notes that an inability to perform a single, particular job does not constitute a substantial limitation on the major life activity of working.  *See* 29 C.F.R. § 1630.1(j)(3)(I).  Rather, a plaintiff must demonstrate she is "significantly restricted in the ability to perform either a class of jobs or a broad range of jobs in various classes . . . ."  *Id.* at § 1630.1(j)(3)(j).  *See Giordano v. City of New York,* 274 F.3d 740, 747 (2d Cir. 2001).  Levine has made no such showing.

impairment "merely affected" a major life activity; a plaintiff must demonstrate that impairment substantially limits those activities). *See generally Montgomery v. Chertoff*, 2007 WL 1233551, at *9 (E.D.N.Y. Apr. 25, 2007) ("Neither 'conclusory statements, conjecture,[n]or speculation' suffices to defeat summary judgment.") (quoting *Kulak v. City of New York*, 88 F.3d 63, 71 (2d Cir. 1996)).

Levine has failed to provide sufficient, non-conclusory information to permit a trier of fact to conclude that her impairment substantially limited the major life activity of caring for oneself, or any other major life activity.   Levine's affidavit contains the following with regard to this issue:

> 5.  Bipolar Disorder: I suffer from Bipolar Disorder.  I also had Lyme's [sic] disease which substantially worsened my Bipolar Disorder.  I described many of my symptoms in my deposition. These symptoms affected me so substantially that I had extreme difficulty performing basic tasks, such as caring for myself or performing basic tasks.  At some point I was having so much difficulty that I had to move in with my mother so she could help care for me.  I had substantial difficulties performing basic functions, such as cooking, laundry, balancing check book [sic], paying bills and other similar basic functions.  My attention span decreased substantially; I had difficulty focusing and concentrating, as well as with my short term memory.  The joint pain was so severe at times, that I had difficulty rising from my bed or chairs. This caused to me [sic] experience fatigue which affected my ability to work.  In sum, these symptoms substantially affected me in numerous ways.  This is a permanent condition that will remain with me for my lifetime.

> 6.  Lyme's [sic] Disease: I suffered from Lyme's [sic] Disease which lowers my immunity system.  The concussion which I sustained in October 2002 [sic] was worsened by the existence of my Lyme's [sic] Disease.  Both of these conditions also interacted with my Bipolar Disease as all of these ailments were affecting me at the same time. I believe that it was the combination of these conditions that affected me so negatively as I described in

20

> paragraph 5 above.   In addition to the above issues, as a direct
> result of Lyme's [sic] Disease, I also had migraine headaches.  I
> had great sensitivity to light and sound.  For a period of time, I
> could not drive as a result of the vertigo. I had circulatory
> problems, which caused numbness in my toes and fingertips, which
> affected my fine motor skills, as well as my gait.  The Lyme's [sic]
> Disease was treated and my symptoms decreased over time.  By
> April 2002, many of the symptoms still existed, but I felt I was
> well enough to return to work and my Doctor approved my return.

Levine Aff. ¶¶ 5-6.

Claiming that she was unable to drive "for a period of time" without specifying that that period of time was "during the time span when she was hired and fired by the defendant," *Jacques v. DiMarzio, Inc.,* 200 F. Supp. 2d 151, 157 (E.D.N.Y.  May 6, 2002), *vacated and remanded in part on other grounds and affirmed in part,* 386 F.3d 192 (2d Cir. 2004) (ellipses, brackets and citation omitted), is insufficient.  Moreover, no reference is provided as to what "for a period of time" means.  A period of time could mean one month or six.  Given that the trier of fact must consider whether the impact of the impairment is permanent or long term, or expected to be long term, it was incumbent on Levine to be more specific.  Similarly, stating that at some point she had to move in with her mother so that her mother could care for her without specifying when and for how long is insufficient to sustain her burden on this motion.  *See Lorinz v. Turner Constr. Co.*, 2004 WL 1196699, at *4 (E.D.N.Y. May 25, 2004) (sporadic lapses in ability to care for oneself does not constitute a substantial limitation).  Averring that her sleep was affected is not helpful without showing that the inability to sleep was substantial and significantly restricted as compared to the average person.  *See id.* at *3.   Asserting that her fine motor skills and gait were affected without describing those affects does not sustain her burden.  *Cf.  Teachout*, 2006 WL 452022, *5 (taking longer to complete tasks due to dyslexia does not ordinarily qualify as a

disability under the ADA; however, a "theoretical ability to perform work tasks if given some commercially impractical or totally unreasonable period in which to complete them would not defeat a finding of disability"). [I]t is not enough for a plaintiff to prove that an impairment 'implicates' a major life activity - he or she must prove that it is the impairment that 'substantially limits' the activity." *Bartlett v. N.Y. State Bd. of Law Exam'rs*, 226 F.3d 69, 84 (2d Cir. 2000).

Compounding the conclusory assertions in her affidavit is the lack of any medical evidence to support her claim that she was substantially limited in a major life activity.[13] *See, e.g., Heilweil v. Mount Sinai Hosp.*, 32 F.3d 718, 723 (2d Cir. 1994) (dismissing ADA claim for lack of medical evidence); *Douglas v. Victor Capital Group*, 21 F. Supp. 2d 379, 392 (S.D.N.Y. 1998) ("plaintiff's testimony as to the alleged limits on his ability to walk, without supporting medical testimony, simply is not sufficient to establish his prima facie case under the ADA"); *Infantolino v. Joint Indus. Bd.*, 2006 WL 3065591, at *6-7 (E.D.N.Y. Sept. 25, 2006) (finding that critical to the plaintiff's failure to submit evidence of any limitation on a major life activity was the absence of medical evidence supporting any limitation); *cf. Johnson v. St. Clare's Hosp.*, 1998 WL 213203, at *8 (S.D.N.Y. Apr. 30, 1998) (claim that conduct which led to discharge was the result of disability rejected for failure to provide medical evidence to support causation). The absence of such medical evidence precludes a trier of fact from concluding that Levine's impairment substantially limited a major life activity.

Based on the foregoing analysis and applying the applicable law in the context of the evidence presented - construed, as it must be, most favorably to her, the Court concludes that

---

[13] Having reviewed the Plaintiff's deposition, the Court notes that it too is devoid of specifics.

Plaintiff has not presented sufficient evidence for the trier of fact to conclude that she had a mental or physical impairment that substantially limited one or more of her major life activities.

2. <u>Does Plaintiff have a record of impairment?</u>

The ADA's definition of disability may be satisfied if a plaintiff demonstrates "a record" of an impairment that substantially limits one or more major life activities.  42 U.S.C. § 12102(2)(B).  The definition is satisfied "if a record relied on by an employer indicates that the individual has or has had a substantially limiting impairment."  *Colwell,* 158 F.3d at 645 (citing 29 C.F.R. pt. 1630, App. 1630.2(k)).  "The record must be one that shows an impairment that satisfies the ADA; a record reflecting a plaintiff's classification as disabled for other purposes or under other standards in not enough."  *Id.*

The record in this case consists solely of the Doctor's notes submitted to the District in connection with Plaintiff's leave requests.  These notes merely state a diagnosis and recommend a continuation of sick leave.   The notes do not state that the diagnosed impairments substantially or otherwise limit one or more of plaintiff's major life activities.  They are insufficient to constitute a record of disability.  *See LaBella v. New York City Admin. for Children's Svcs.*, 2005 WL 2077192, at * 14 (S.D.N.Y.  Mar. 28, 2005).

3. <u>Was Plaintiff regarded as disabled?</u>

Levine also claims that she meets the ADA definition of disabled because the District regarded her as disabled.  This claim depends not on the existence of an actual disability but on "the employer's perception of the employee" and is a question of "intent."  *Capobianco*, 422 F.3d at 57 (citations and internal quotations omitted).  "It is not enough that the employer perceive the employee as somehow disabled; the employer must regard the employee as disabled within the

meaning of the ADA, i.e., having an impairment that substantially limits a major life activity." *Id.*

*Accord, Jacques,* 386 F.3d at 201; *Colwell,* 158 F.3d at 646.

Plaintiff's argument in support of this claim is as follows:

> Defendants perceived Plaintiff as disabled because when she submitted a note from Dr. Petro clearing her to return to work, Defendants would not allow her to return to work. A reasonable juror may infer that the District did not let her return to work because it felt that her disability precluded her from performing her duties properly.
> Moreover, Grossman and Klein barely had any time to assess plaintiff's job performance and when Grossman actually observed plaintiff, his report was generally good. Additionally, all of the plaintiff's prior evaluations were positive. Thus, the only negative thing that Grossman and Klein knew of plaintiff's performance was that she missed work due to her various medical conditions. A jury could conclude that they perceived her as incapable of doing the job and acted on said assumption. In other words, their actions, in light of their observation, evidences that they perceived her as disabled.

Pl.'s Opp. Mem. 11 (citations to record omitted).

Plaintiff's claim, premised on the argument that defendants perceived her as unable to do her job, must fail. Even if Defendants perceived her as unable to do her job, that by itself does not provide evidence that Defendants "perceived her as disabled within the meaning of the ADA since '[t]he inability to perform a single, particular job does not constitute a substantial limitation in the major life activity of working.'" *Temple v. Bd. of Educ.*, 322 F. Supp. 2d 277, 281 (E.D.N.Y. 2004). Nor does the fact that the District afforded her a paid leave of absence indicate a perception that Levine was substantially impaired in a major life activity. *See Rider v. Gen'l Motors Corp.*, 2006 WL 1520084, at * 8 (W.D.N.Y. May 26, 2006). Plaintiff has not shown "that the District regarded her not merely as unable to work in her specific job, but disabled from a

'broad range of jobs' as compared with 'the average person having comparable training, skills and abilities." *Doe v. Bd. of Educ. of Fallsburgh Cent. Sch. Dist.*, 63 Fed. Appx. 46, 49 (2d Cir. 2003) (quoting *Bartlett v. N.Y. State Bd. of Law Exam'rs*, 226 F.3d 69, 82-83 (2d Cir. 2000)).

    *Giordano v. City of New York,* 274 F.3d 740 (2d Cir. 2001) is instructive. In *Giordano*, the plaintiff, a police officer, claimed that the defendants erroneously "regard him as disabled" within the ADA. According to the plaintiff, defendants mistakenly believed - and defendants acknowledged that they believed - that "Coumadin [an anticoagulent blood thinner prescribed for plaintiff to prevent the danger of blood clotting arising from his artificial aortic valve] renders him unable to safely perform the essential functions of a police officer without danger to himself or others." *Id.* at 748. In affirming the district court's grant of summary judgment on the ground that no record evidence suggested that the defendants perceived the plaintiff as unable to work in a broad class of jobs, the Court wrote:

> Giordano introduced evidence that establishes at most that the defendants regarded him as disabled from police or other investigative or security jobs that involve a substantial risk of physical confrontation. The record contains no evidence from which we can infer that the defendants thought or had grounds for thinking, that other jobs in the public or private sector – such as, for example, a job as a security guard or private investigator, or with a police department that does not require every officer to be capable of patrol duty – carry the same nature or degree of risk. Giordano stated in an affidavit that the very "duties of police officer which defendants claim [he] cannot perform are the kinds of duties which [he] would have to perform . . . as a private investigator and/or in security which are really the only related fields for which [he is qualified]." The district court correctly noted, however, that Giordano adduced no evidence of the qualifications for these jobs. His assumption that his disqualification from the specific duties of an NYPD police officer will preclude him from working in related fields – or that the defendants perceived him as such – is, as the district court noted, "[s]peculation and conjecture' which will not

suffice to defeat a motion for summary judgment."  *Giordano*, 2001
WL 204202, at *4, 2001 U.S.Dist. LEXIS 2039, at *11 (citing
*Cifarelli v. Vill. of Babylon*, 93 F.3d 47, 51 (2d Cir. 1996));  *see
also Tubens v. Police Dept.*, 48 F. Supp. 2d 412, 419 (S.D.N.Y.
1999) (noting that the plaintiff 'has demonstrated at most that the
NYPD perceived her as substantially limited in performing only a
narrow range of jobs – those requiring strenuous isometric
exercise," and that '[the plaintiff] has not provided specific
evidence about the kinds of jobs for which she alleges the NYPD
perceived her to be disqualified.").

274 F.3d at 749-50 (brackets and ellipses in original).

Here, Plaintiff does not even argue, no less put forth evidence, that Defendants regarded
her as unable to perform any class of jobs.   Her evidence and her arguments are limited to
Defendants alleged perception that she could not perform *her* job.  This is patently insufficient to
sustain her burden.  To paraphrase the *Giordano* Court: "[Her] assumption that [her]
disqualification from the specific duties of [a school psychologist] will preclude [her] from
working in related fields – or that the defendants perceived [her] as such – is . . . 'speculation and
conjecture' which will not suffice to defeat a motion for summary judgment."

In sum, Levine has failed to proffer sufficient evidence to permit a trier of fact to conclude
that she is disabled within the meaning of the ADA.  Having failed to establish this element of her
prima facie case, it is unnecessary for the Court to address the other elements needed to sustain
her federal causes of action.  The motion for summary judgment is granted as to the ADA and §
1983 claims.

**III.  Plaintiff's New York State Human Rights Law Claim.**

While disability discrimination claims under the ADA and the New York State Human
Rights Law, N.Y. Exec. Law § 296, *et seq*. ("NYSHRL") are analyzed similarly, the definition of

26

disability is broader under the NYSHRL.  *See State Div. of Human Rights v. Xerox Corp.*, 65

N.Y.2d 213, 218-19 (1985); *Shannon v. New York City Transit Auth.,* 332 F.3d 95, 104 n.2 (2d

Cir. 2003); *Branson v. Ethan Allen, Inc.*, 2004 WL 2468610, at *3 (E.D.N.Y. Nov. 3, 2004).   A

disability under the NYSHRL is a condition that either (1) prevents the exercise of a normal

bodily function or (2) is "demonstrable by medically accepted clinical or laboratory diagnostic

techniques." *Reeves* , 140 F.3d at 155.  "Thus an individual can be disabled under the [Human

Rights Law] if his or her impairment is demonstrable by medically accepted techniques; it is not

required that the impairment substantially limit that individual's normal activities." *Lovely H. v.*

*Eggleston*, 235 F.R.D. 248, 260 (S.D.N.Y. 2006) (quoting *Hazeldine v. Beverage Media Ltd.*, 954

F. Supp. 697, 706 (S.D.N.Y. 1997)).  In other words, any "medically diagnosable impairment" is a

disability under the NYSHRL.  *Barr v. New York City Trans. Auth.*, 2002 WL 257823, at *8

(E.D.N.Y. Feb. 20, 2002).  The Court's grant of summary judgment on the ADA claims is

therefore not dispositive of Plaintiff's state law claims.

      However, having found that Levine's ADA claim fails as a matter of law, there is no

longer any independent basis for federal jurisdiction in the within action.  Although the Court has

the discretion to exercise supplemental jurisdiction over Plaintiff's remaining NYSHRL claim,

*see* 29 U.S.C. § 1367(a), it declines to do so as resolution of the state claim would require the

determination of additional factual and legal issues.  *See* 28 U.S.C. § 1367(c)(3) ("The district

court may decline to exercise supplemental jurisdiction over a claim . . . if . . . the district court

has dismissed all claims over which it has original jurisdiction . . . ."); *N.Y. Mercantile Exch., Inc.*

*v. Intercontinental Exch., Inc.*, 497 F.3d 109, 119 (2d Cir. 2007) ( holding that dismissal of

remaining state claims after the dismissal of federal claims is particularly appropriate where the

resolution of the state law claims entails resolving additional legal and factual issues). "While discovery has been completed and the instant case proceeded to the summary judgment stage, it does not appear that any discovery would need to be repeated if [Plaintiff's] pendent claim [] [was] brought in state court." *Tishman v. The Associated Press,* 2007 U.S. Dist. LEXIS 85588, at *28-29 (S.D.N.Y. Nov. 19, 2007). Moreover, "'[s]ince [New York CPLR § 205] allows a plaintiff to recommence a dismissed suit within six months without regard to the statute of limitations,' plaintiff[] will not be prejudiced by the dismissal of [her NYSHRL] claim[]." *Id.* (quoting *Trinidad v. N.Y. City Dept. of Corr.*, 423 F. Supp. 2d 151, 169 (S.D.N.Y. 2006) (alterations in original) (additional citations omitted).

Accordingly, Plaintiff's NYSHRL claim is dismissed without prejudice.

## Conclusion

For the reason set forth above, Defendants' motion for summary judgment is granted on the ADA and § 1983 claims and the NYSHRL claim is dismissed without prejudice. The Clerk of Court is directed to close this case.

**So Ordered.**

Dated: Central Islip, New York
      July 14, 2008

/s/ _____
Denis R. Hurley
Senior District Judge